UNITED STATES DISTRICT COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

CHERYL FERRELLI *et al.*,

                Plaintiffs,

   -against-                                      1:22-CV-0068 (LEK/CFH)

STATE OF NEW YORK UNIFIED
COURT SYSTEM *et al.*,

                Defendants.

---

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

Plaintiffs, employees of the New York Unified Court System ("NYUCS"), bring this action for injunctive, declaratory, and monetary relief against Defendants NYUCS, Nancy Barry in her official capacity as Chief of Operations for NYUCS, and Justin Barry in his official capacity as Chief of Administration for NYUCS. <u>See</u> Dkt. No. 1 ("Complaint"). Plaintiffs challenge the vaccine mandate issued by NYUCS in September 2021 and seek to enjoin its enforcement. Presently before the Court is Plaintiffs' request for a temporary restraining order and preliminary injunction. Dkt. No. 4-1 ("Plaintiffs' Memorandum"). Defendants have filed their response, Dkt. Nos. 11 ("Response"), and Plaintiffs have filed their reply. Dkt. No. 18 ("Reply").

Vaccines are a critical tool for combatting the COVID-19 pandemic and saving lives. They help to protect not only each vaccinated individual, but also the community as a whole. In imposing a vaccine mandate, NYUCS seeks to protect the health and wellbeing of its employees and all those who utilize the state court system. At the same time, protection of community health must coexist with the respect for religious liberty embedded in the First Amendment of

the United States Constitution. Plaintiffs recognize the need to address COVID-19, proposing measures such as masking, testing, and remote work as an alternative to vaccination. See Pl.s' Mem. at 17. Defendants recognize the need to respect religious liberty, having granted over 500 requests for religious exemptions from the vaccine mandate. Dkt. No. 12-2 ¶ 11. The parties disagree, however, about whether Defendants have followed a proper procedure for balancing these important interests. That is the question this Court must decide.

For the reasons stated below, Plaintiffs' request for a temporary restraining order and preliminary injunction is denied.

## II.   BACKGROUND

### A. The Parties

Defendant NYUCS is the Court system for the state of New York, including thirteen judicial districts across the state's 62 counties. Dkt. No. 12-1 ¶ 5. It employs nearly 1,300 judges and 15,650 non-judicial employees across more than 300 separate sites. Id. ¶ 6. Defendant Nancy Barry is the Chief of Operations for NYUCS and Defendant Justin Barry is the Chief of Administration for NYUCS. Compl. ¶¶ 7, 8.

Plaintiffs Cheryl Ferrelli, Jeanmarie Trojan, Eileen Creighton, Linda Rukavina, and Josette Altobelli are employees of NYUCS. Id. ¶¶ 1–5, 11. Ferrelli, Trojan, Creighton, and Rukavina are court reporters residing in Suffolk County, New York, and Altobelli is a senior law reporting assistant residing in Albany County, New York. Id. ¶¶ 1–5, 15, 25, 35, 45, 55.

### B. The COVID-19 Pandemic

SARS-COV-2 ("COVID-19" or "COVID") is a deadly virus that has killed over 950,000 Americans[1] and over 54,000 New Yorkers[2] since March of 2020. The first vaccine for COVID-19 received emergency use authorization from the Food and Drug Administration ("FDA") on December 11, 2020,[3] and final approval on August 23, 2021.[4] Today, 85.7% of New Yorkers over the age of 18 and 75.7% of all New Yorkers are fully vaccinated.[5] Fully-vaccinated New Yorkers have about a 76% lower chance of being diagnosed with COVID-19 and between a 90.1% and 95.9% lower chance of being hospitalized with COVID-19 than unvaccinated New Yorkers.[6]

### C. NYUCS's COVID-19 Response

In March 2020, the initial outbreak of COVID-19 in New York led NYUCS to suspend nearly all in-person operations. See Dkt. No. 12-1 ¶¶ 15–18. NYUCS also postponed all jury trials and non-essential functions. Id. ¶ 16. In May 2020, NYUCS returned to modified in-person

---

[1] See COVID-19 Dashboard, Johns Hopkins University of Medicine, found at https://coronavirus.jhu.edu/map.html (last viewed March 7, 2022).

[2] See COVID-19 Fatalities, New York State Department of Health, found at https://coronavirus.health.ny.gov/fatalities-0 (last viewed March 7, 2022).

[3] Press Release, U.S. Food and Drug Administration, FDA Takes Key Action in Fight Against COVID-19 By Issuing Emergency Use Authorization for First COVID-19 Vaccine (Dec. 11, 2020), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine.

[4] Press Release, U.S. Food and Drug Administration, FDA Approves First COVID-19 Vaccine (Aug. 23, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine.

[5] See Vaccination Progress to Date, New York State Department of Health, found at https://coronavirus.health.ny.gov/vaccination-progress-date (last viewed March 7, 2022).

[6] See COVID-19 Breakthrough Data, New York State Department of Health, found at https://coronavirus.health.ny.gov/covid-19-breakthrough-data (last viewed March 7, 2022).

staffing. Id. ¶ 24. With increasing vaccination rates and decreasing rates of COVID-19 infection, NYUCS announced a return to 100% on-site staffing in May 2021. Id. ¶ 27. However, NYUCS was unable to completely eliminate the COVID-19 risk associated with in-person operations and determined that widespread use of vaccines provided the only hope of returning to near-normal operations. Id. ¶ 29.

In August 2021, NYUCS revised its mask policy to allow vaccinated employees to stop wearing masks. Id. ¶ 30. At that time only 30% of NYUCS judges and employees were fully vaccinated. Id. NYUCS encouraged its employees to get vaccinated by offering incentives such as compensatory time off, however a significant number of judges and employees still did not report vaccination. Id. In late summer 2021, as NYUCS attempted to return to full capacity for criminal trials and to address the backlog of cases created by previous COVID-19 measures, the delta variant caused a new surge in cases. See id. ¶¶ 32–33. On September 7, following FDA approval of the Pfizer vaccine on August 23, 2021, NYUCS implemented a mandatory testing program, requiring all unvaccinated judges and employees to submit proof of weekly COVID-19 tests. Id. ¶¶ 34, 36. Three weeks later, on September 27, 2021, NYUCS's vaccine mandate went into effect. Id. ¶ 36.

D.  The Vaccine Mandate

NYUCS's vaccine mandate required all judges and employees to get vaccinated, but included exemptions for those with valid religious or medical reasons. Id. ¶ 40. Employees in the process of seeking an exemption were not required to get vaccinated and faced no disciplinary or other adverse actions in the meantime. Id. Employees who failed to get vaccinated or obtain an exemption would lose access to NYUCS facilities and face disciplinary action including lost wages, lost benefits, suspension, or termination. Id. ¶ 41. Justin Barry states that

> [w]ithout the UCS's policy requiring vaccination, I have grave concerns that more people—including court employees and users of the courts—will get sick and potentially die from COVID-19. That would, in turn, threaten the public health and safety and the effective operation of the court system, through (i) an increase in breakthrough infections in vaccinated employees, (ii) vulnerability to future variants of COVID-19, (iii) a potential brain drain of employees who want to work in an environment where their colleagues are vaccinated but who will decline to work in person if they know that the vaccine policy is not being uniformly enforced, and (iv) the continued limited availability of criminal trials, which makes it difficult for the courts to provide a forum to vindicate litigants constitutional rights.

Id. ¶ 43. Justin Barry further notes that

> [u]nlike other private and many public entities, federal and state constitutional concerns—including, but not limited to, access to justice generally, criminal due process rights, and the right to a public trial—severely limit UCS's authority to require proof of vaccination status from litigants, court users, and the general public before granting access to UCS courthouses.

Dkt. No 12-2 ¶ 10.

### E. The Exemption Process

NYUCS put in place an 11-member Vaccination Exemption Review Committee (the "Committee") to implement both medical and religious exemptions from its vaccination requirement. Dkt. No. 12. ¶ 8. The Committee has implemented the UCS's vaccination exemption program in consultation with its in-house and outside counsel and with the unions representing employees. Id. ¶ 9. As of February 2, 2022, NYUCS had granted 536 requests for religious exemptions and denied 363. Id. ¶ 11. It had also granted 82 requests for medical exemptions and denied 166. Id. ¶ 12.

The Committee created a two-page form for employees to use to request religious exemptions. Id. ¶ 13. The first page of the form askes the applicant to affirm the truth of several

statements about the applicant's beliefs and willingness to comply with certain additional safety measures. Id. ¶ 14; see also Dkt. No. 12-3 at 3. The second page states:

> In the space below, please provide a personal written and signed statement detailing the religious basis for your objection, explaining why you are requesting this religious exemption, the religious principle(s) that guide your objections to vaccination, and the religious basis that prohibits the COVID-19 vaccination. Attach additional pages, if needed, along with any documentation you submit in support of your request.

Dkt. No. 12. ¶ 15; Dkt. No. 12-3 at 4. After receiving many completed application forms, the Committee found the two most common reasons for seeking a religious exemption were (1) concern about the connection between COVID-19 vaccines and fetal cells, and (2) concern about the sanctity or purity of the applicant's body. Dkt. No. 12. ¶ 16. Because the committee often found the information in applicants' personal statements insufficient to assess the basis for and sincerity of the belief, it created a supplemental form. Id. ¶¶ 17–18. Section A of the supplemental form focuses on concerns about use of fetal cells, while Section B of the form focuses on concerns about the sanctity or purity of the body. Id. ¶ 18. In particular, Section A inquires as to applicants' use of other medications and vaccinations that were tested using fetal cell lines, and requests explanations of inconsistencies in past or present use of such products. Dkt. No. 12-4 at 2–4. Section B requests information about other medicines, medical treatments, vaccines and/or foods from which the applicant abstains due to her religious beliefs; when she began abstaining; and why her faith requires such abstention. Id. at 5–6. The vast majority of applicants for religious exemptions were required to complete the supplemental form. Dkt. No. 12. ¶ 19.

The Committee is divided into two working groups, each of which reviews applications. Id. ¶ 20. A quorum of at least three members is required at each working group review meeting,

and a majority of those present is required to grant or deny an application. Id. Any application denied by a working group goes to the full committee for further review and can only be denied by a majority of a quorum of five members of the full committee. Id. ¶ 21. All identifying information about each applicant is redacted prior to committee consideration of submitted materials. Id. ¶ 21. Justin Barry states:

> the review is solely to determine whether the applicant's opposition to being vaccinated is based on a sincerely held religious belief. Applications are not denied based on what the belief is or the source of the belief, or whether the applicant identifies with one particular religion or another. Employees professing adherence to varying religions or faiths have been granted exemptions. The Committee did not in any way seek to assess the validity of any of plaintiffs' religious beliefs.

Id. ¶ 23.

Upon denial of an application, the committee sends the applicant a notice stating that the request was denied and that the applicant must submit proof of the first dose of a COVID-19 vaccination within ten days. Id. ¶ 24. If an employee fails to provide such notice within ten days, the employee's manager informs the employee that proof of vaccination must be submitted by the close of business the following day. Id. ¶ 25. An employee who still does not comply is declared "unfit" for service, barred from continuing to work, and required to charge the time against any accrued compensatory time or annual leave. Id. Once that time runs out, the employee is placed on "lost time." Id. Employees on lost time do not receive pay but continue to receive benefits until notified otherwise by the New York State Civil Service Commission. Id. As of February 4, 2022, no employees had been terminated following denial of a religious exemption. Id.

### F. Plaintiffs' Applications and Denial

On or about September 10, 2021, each plaintiff was informed of the COVID-19 vaccine mandate by Nancy Barry and Justin Barry. Compl. ¶¶ 16, 26, 36, 46, 56. Each plaintiff completed the initial two-page religious exemption application. Id. ¶ 13. All agreed to undertake the masking, social distancing, and testing required to obtain an exception. Id. Each plaintiff also submitted a personal statement explaining that she is a devout Christian and that receiving a COVID-19 vaccine is inconsistent with her religious beliefs. Id. ¶¶ 17, 27, 37, 47, 57. On or about November 18, 2021, each Plaintiff was asked to complete the supplemental form. Id. ¶¶ 19, 29, 39, 49, 59. Ferrelli, Trojan, Creighton, and Rukavina declined to provide any supplemental information and instead submitted a letter from their counsel asserting that the request for additional information was unlawful. Dkt. No. 12. ¶ 27. Altobelli responded to most of the questions on the supplemental form. Dkt. No. 4-8. Altobelli also applied for and was granted a temporary medical exemption until February 25, 2022. Dkt. No. 12. ¶ 28. Rukavina has an outstanding medical exemption request that has not yet been decided. Dkt. No. 12. ¶ 29.

On or about January 6, 2022, each plaintiff was informed that her application for a religious exemption had been denied and was not provided with a statement of reasons. Compl. ¶¶ 22, 32, 42, 52, 62. Each Plaintiff was directed to submit proof of at least one vaccine dose by January 18, 2022, and to continue receiving weekly COVID-19 tests until fully vaccinated. Id. ¶¶ 24, 34, 44, 54, 64; Dkt. Nos. 9, 17, 25, 34, 42.

Justin Barry states that "[t]he applications of plaintiffs Ferrelli, Trojan, Creighton, and Rukavina were not rejected because their religious beliefs were disfavored compared to others, but because they refused to submit the Supplemental Form." Dkt. No. 12 ¶ 30. Similarly, he states that "Altobelli's application for a religious exemption also was not rejected because her religious views were disfavored. Rather, the Committee decided that her responses to the

8

Supplemental Form did not support her claim that her refusal to receiving (sic) the COVID-19 vaccine was based on a sincerely held religious belief." Id. ¶ 31. He further notes that "UCS has granted many exemption applications from applicants who, like plaintiffs, have explained that they seek an exemption due to their concern about the connection between fetal cell lines and the COVID-19 vaccine and/or because of a belief in the sanctity and purity of their body." Id. ¶ 32.

### G. Procedural History

On January 25, 2022, Plaintiffs, filed their Complaint in this matter arguing that both Defendants' vaccine mandate as a whole, and the religious exemption process in particular, violated their First Amendment right to freedom of religion. See generally Compl. On January 26, 2021, Plaintiffs filed the present motion requesting a temporary restraining order and preliminary injunction. See Dkt. No. 4. On February 22, 2022, the case was stayed, with the consent of the parties, pending a decision from the Second Circuit in Kane, et al. v. de Blasio, et al., No. 21-3047 (2d Cir. 2021) and Keil, et al. v. City of New York, et al., No. 21-3043 (2d Cir. 2021), or until two weeks had elapsed. Dkt. No. 22. Plaintiffs also agreed to have the Court resolve their combined motions for a temporary restraining order and for a preliminary injunction simultaneously with a single order. Id.

### III. LEGAL STANDARD

The standard that governs a request for a temporary order is the same as that governing a request for a preliminary injunction. Stagliano v. Herkimer Cent. Sch. Dist., 151 F. Supp. 3d 264, 272 (N.D.N.Y. 2015) (citing Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n, 965 F.2d 1224, 1228 (2d Cir. 1992)). Where "a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction."

9

Hopkins Hawley LLC v. Cuomo, 518 F. Supp. 3d 705, 713 (S.D.N.Y. 2021) (quoting Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton, 841 F.3d 133, 143 (2d Cir. 2016)).

IV.     **DISCUSSION**

   **A. Defendants' Procedural Arguments**

To start, the Court construes Plaintiff's request for a temporary restraining order and preliminary injunction as seeking solely injunctive relief and seeking that relief solely against Defendants Nancy Barry and Justin Barry in their official capacities. See Reply at 8–10 (Plaintiff's clarifying that their Motion does not seek relief against NYUCS nor any monetary relief). Furthermore, the Court need not consider Defendants' argument that Plaintiff Altobelli lacks standing because "where, as here, multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017) (quoting Rumsfeld v. Forum of Acad. and Inst. Rights, Inc., 547 U.S. 47, 52 n.2 (2006)).

Thus, Defendants' only procedural argument meriting additional analysis is their contention that Nancy Barry and Justin Barry's roles in enforcing the mandate are not sufficient to qualify them for the Ex parte Young exception to Eleventh Amendment immunity. See Resp. at 14. Because, as described below, the Court finds Plaintiffs unlikely to succeed on the merits, it declines at this time to address whether Nancy Barry and Justin Barry are the proper defendants. See Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 221 (1985) ("Given our resolution of the case, we need not consider the question whether the relief sought by Ewing would be available under Eleventh Amendment principles."); Edwards v. Mejia, No. 11-CV-9134, 2013

10

WL 1092978, at *5 (S.D.N.Y. Mar. 15, 2013) (declining to consider Eleventh Amendment argument because plaintiff's claim failed on other grounds).

### B. Likelihood of Success on the Merits

Plaintiffs contend that both the vaccine mandate as a whole, and the religious exemption process as applied to them, represent violations of their First Amendment right to freedom of religion. See generally Pl.s' Mem. The Court evaluates each in turn.

#### 1. The Vaccine Mandate as a Whole

In general, "the Free Exercise Clause 'does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene, 763 F.3d 183, 193 (2d Cir. 2014) (quoting Employment Division v. Smith, 494 U.S. 872, 879 (1990)). "Such laws are subject to rational basis review." Id. By contrast, where "challenged restrictions are not 'neutral' and of 'general applicability,' they must satisfy 'strict scrutiny,' and this means that they must be 'narrowly tailored' to serve a 'compelling' state interest." Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 67 (2020).

In evaluating whether NYUCS's vaccine mandate is neutral and generally applicable, the Second Circuit's recent decision in Kane v. De Blasio, 19 F.4th 152, 160 (2d Cir. 2021) is particularly instructive. In Kane, New York City imposed a vaccine mandate on individuals working in New York City schools. 19 F.4th at 158. The mandate initially contained no provision for medical or religious exemptions, but after the United Federation of Teachers filed a formal objection, an independent arbitrator set forth a process and standards for granting such exemptions. Id. at 160. The exemption process involved requirements including that the leader of an applicant's religious organization not have spoken in support of vaccines, and that the

11

applicant produce a letter from a religious official. Id. As discussed below, the Second Circuit struck down this process. See id. at 176. Nonetheless, the Court found the vaccine mandate as a whole to be neutral and generally applicable. Id. at 164–66.

To evaluate neutrality, the Court first considered whether the mandate was facially discriminatory. Id. at 164. Because the mandate applied "to 'all D[epartment of Education ("DOE")] staff,' as well as City employees and contractors of DOE and the City who work in DOE school settings," and did "not single out employees who decline[d] vaccination on religious grounds" the Court found it facially neutral. Id. In addition, the Court considered whether the mandate ran "afoul of the neutrality principle [by] 'target[ing] religious conduct for distinctive treatment,'" but found proffered evidence of non-neutrality, including comments by the mayor, to be unconvincing. Id. at 164–65 (quoting Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993)).

In evaluating whether the mandate was generally applicable, the Kane court noted that under Smith, 494 U.S. 872 (1990), a law is not generally applicable if either "it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions;" or "it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." Kane, 19 F.4th at 165 (quoting Fulton v. City of Philadelphia, Pennsylvania, 141 S. Ct. 1868, 1871 (2021)). Furthermore, the Court held that a mandate is not individualized merely because it includes express exceptions, rather, to demonstrate that a law is not generally applicable "there must be some showing that the exemption procedures allow secularly motivated conduct to be favored over religiously motivated conduct." Id. Concluding that there was no evidence of such

favoritism, the court found the overall vaccine mandate to be neutral and generally applicable, warranting only rational basis review, a standard which the mandate easily satisfied. Id. at 166.

The reasoning of the Kane court applies directly to the case at hand.[7] First, the vaccine mandate is facially neutral because it applies to all judges and employees of the state court system, and in no way singles out those who decline vaccination on religious grounds. See Dkt. No. 12-1 ¶ 36. While in Kane, Plaintiffs argued that the mayor's statements rendered the mandate non-neutral, here there is no similar contention. As such, the Court finds the mandate to be neutral.

Similarly, the reasoning of Kane applies with regard to general applicability. Under Kane, the mandate does not cease to be generally applicable merely because it contains an exemption process, rather it becomes individualized only upon a showing that "the exemption procedures allow secularly motivated conduct to be favored over religiously motivated conduct." 19 F.4th at 165. Here, there is no such evidence. Indeed, the only form of secular exception available is the medical exemption, and Defendants have granted 60% of requests for religious exemptions while granting only 33% of requests for medical exemptions. Dkt. No. 12. ¶¶ 11–12. As such, the mandate is generally applicable and subject to rational basis review.

As in Kane, the mandate easily meets the rational basis standard. Rational basis review requires only that Defendants have chosen a "means for addressing a legitimate goal that is rationally related to achieving that goal." Kane, 19 F.4th at 166. Preventing the spread of COVID-19 within the state court system, both to protect health and promote efficient access to

---

[7] The Court notes that "[i]t is settled law that a district court in this Circuit is bound by [Second Circuit] decisions unless and until they have been overruled by the Supreme Court or the law is otherwise changed. Medwig v. Long Island R.R., No. 06-CV-2568, 2007 WL 1659201, at *4 (S.D.N.Y. June 6, 2007).

13

justice, is a legitimate state goal and requiring employees to become vaccinated is rationally related to achieving that goal. See, e.g., id. (holding that a vaccination requirement for school teachers "plainly satisfies this standard"); We The Patriots USA, Inc. v. Hochul, 17 F.4th 266, 290 (2d Cir.), opinion clarified, 17 F.4th 368 (2d Cir. 2021) (holding that a vaccination requirement for healthcare workers "easily meets that standard").

    2. *The Religious Exemption Process as Applied to Plaintiffs*

As demonstrated in Kane, just because a vaccine mandate passes constitutional muster does not mean that its religious exemption process, as applied, is similarly valid. In Kane, the Court found that the religious exemption process created by the independent arbitrator was neither neutral nor generally applicable. 19 F.4th at 168–69. The court found the exemption process non-neutral because "[d]enying an individual a religious accommodation based on someone else's publicly expressed religious views—even the leader of her faith—runs afoul of the Supreme Court's teaching that '[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" Id. at 168 (quoting Hernandez v. Commissioner, 490 U.S. 680, 699 (1989)). The court found the process not to be generally applicable because Plaintiffs presented evidence that the decisionmakers sometimes "strictly adhered to the Accommodation Standards," but "[o]ther times . . . apparently ignored them." Id. at 169.

Here, in arguing for strict scrutiny, Plaintiffs rely on the Supreme Court decision in Fulton, which states: "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by creating a mechanism for individualized exemptions." Pl.s' Mem. at 8 (quoting Fulton, 141 S. Ct. at 1877). In addition to the passage quoted by Plaintiffs, the Fulton Court held that "[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions

14

have been given, because it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." 141 S. Ct. at 1879. This language could plausibly be interpreted as requiring that strict scrutiny apply to every religious exemption process. However, the Court doubts such an interpretation for two reasons. First, such an interpretation would create a perverse incentive for government entities to provide no religious exemption process in order to avoid strict scrutiny. See We The Patriots, 17 F.4th at 281–90 (finding a vaccine mandate without a religious exemption process subject to rational basis review). Second, and more importantly, when read in context, each passage of Fulton quoted above refers to exemption processes that provide the decisionmaker with discretion to favor secular justifications for exemptions over religious justifications. 141 S. Ct. at 1877–79. The Fulton Court emphasized that "[a] law . . . lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way. Id. at 1877. The Fulton Court also cited the example of Sherbert v. Verner, 374 U.S. 398 (1963), where a Seventh-day Adventist was denied unemployment benefits because her refusal to work on Saturdays did not qualify as "good cause" for failing to accept available suitable work. Id. Finally, as Plaintiffs note in their own memorandum, the Fulton Court found that where "a system of individual exemptions exists, 'the government may not refuse to extend that system to cases of religious hardship without a compelling reason.'" Pl.s' Mem at 8 (quoting Fulton, 141 S. Ct. at 1877).

Here, unlike in Fulton, Defendants have not created a system of individualized exemptions and refused to extend it to religious hardships. Rather, they have created a system of religious exemptions and refused to extend it to Plaintiffs based on responses, or lack thereof, to

15

a supplemental form.[8] See Dkt. No. 12 ¶¶ 30–31. Since the Court does not find the mere existence of a religious exemption process to trigger strict scrutiny, it must consider whether the specific religious exemption process created and applied by Defendants was neutral and generally applicable.

While Plaintiffs allege that Defendants have favored some religious beliefs over others, Pl.s' Mem at 8, they have pled no facts to support this contention. Defendants deny this assertion and note that exemptions have been granted to many employees who have requested exemptions on the same bases as Plaintiffs. Dkt. No. 12 ¶¶ 30–32. Indeed, Plaintiffs Ferrelli, Trojan, Creighton, and Rukavina's applications for religious exemptions were denied, not because of their professed beliefs, but because they failed to complete the supplemental form. Thus, their only remaining argument for application of strict scrutiny is that use of the supplemental form itself was not neutral. See Troogstad v. The City of Chicago, No. 21-CV-5600, *25 (N.D. Ill. Nov. 24, 2021) ("Because every denial before the Court at the present time fails to comply with the basic requirements of the City Vaccination Policy's religious exemption process, these denials do not raise free exercise concerns."). It is not clear to the Court that Plaintiffs have even raised such arguments in their motion. See generally Pl.s' Mem. Regardless, to the extent such arguments have been raise, the Court finds them unpersuasive. While Plaintiffs describe the supplemental form as NYUCS's "attempt[] to interrogate Plaintiffs through follow up questions by first posing a set of purported factual predicates about the vaccine and then asking a series of

---

[8] The Court further notes that while in Fulton a commissioner was given complete discretion in granting exceptions, 141 S. Ct. at 1878, here Justin Barry described the review process as "solely to determine whether the applicant's opposition to being vaccinated is based on a sincerely held religious belief." Dkt. No. 12 ¶ 23. Thus, unlike in Fulton, the accommodation process clearly defined the sole valid justification for an accommodation and did not "invite the government to decide which reasons for not complying with the policy are worthy of solicitude." 141 S. Ct. at 1879 (cleaned up).

invasive questions as to Plaintiffs' personal religious beliefs," id. at 11, the Court perceives no such invidious scheme. "[R]egulations that are hostile to the religious beliefs of affected citizens" or "that pass[] judgment upon or presuppose[] the illegitimacy of religious beliefs and practices" are not neutral. Kane, 19 F.4th at 168 (quoting Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n, 138 S. Ct. 1719, 1731 (2018)). Here though, the supplemental form merely provides factual information about the use of fetal cell lines in creating vaccines, asks applicants questions about their use of other products tested on such cell lines, and provides an opportunity to explain how their beliefs may have changed over time or how their beliefs distinguish the COVID-19 vaccines from other products. See generally Dkt. No. 12-4. This line of questioning does not presuppose the illegitimacy of concerns about use of fetal cell lines; it merely seeks to determine whether such concerns are the applicant's true motivation for seeking an exemption.[9] As such, it does not undermine the neutrality of the exemption process.

Unlike the other plaintiffs, Plaintiff Altobelli did submit a supplemental form but was nonetheless denied an exemption. See Resp. at 9; Dkt. No. 4-8. However, aside from generic and unsupported allegations that Defendants favored some religious beliefs over others, Plaintiff's motion raises no argument that Altobelli's request was denied on invalid grounds. As such, given the analysis above, the Court sees no basis for finding that Altobelli's denial triggers strict scrutiny.

---

[9] If an applicant's past actions have demonstrated a concern about the use of such cell lines, that provides strong evidence of the applicant's sincerely held belief. If not, the applicant is provided with opportunities to further explain her beliefs. Of course, the information an applicant provides could be used to discriminate, but that is true of the results of any factual inquiry. Here, Plaintiffs have pled no facts tending to show that such discrimination occurred. Ferrelli, Trojan, Creighton, and Rukavina have not alleged that they were denied accommodation because their supplemental form answers demonstrated inconsistent religious beliefs. Indeed, all four were denied because they refused to complete the form.

Finally, even assuming that strict scrutiny applies to Defendants' religious exemption process, the Court finds the process to satisfy that rigorous test. Strict scrutiny requires that the exemption process be narrowly tailored to serve a compelling state interest. Roman Cath. Diocese of Brooklyn, 141 S. Ct. at 67. Here, there is little doubt that stemming the spread of COVID-19 within the New York State court system is a compelling interest. See, e.g., id. ("Stemming the spread of COVID–19 is unquestionably a compelling interest"); Ass'n of Jewish Camp Operators v. Cuomo, 470 F. Supp. 3d 197, 224 (N.D.N.Y. 2020) ("Multiple courts that have considered the issue have concluded that controlling the spread of COVID-19 counts as a compelling interest.") (internal quotation marks omitted). Thus, the question for the Court is whether Defendants' exemption process, including its requirement to fill out the initial and supplemental forms, was narrowly tailored to the state's compelling interest.

In Kane, the Second Circuit found that narrow tailoring was not met because "denying religious accommodations based on the criteria outlined in the Accommodation Standards, such as whether an applicant can produce a letter from a religious official, is not narrowly tailored to serve the government's interest in preventing the spread of COVID-19." 19 F.4th at 169. But while the state is not entitled to evaluate the legitimacy of religious beliefs, courts have made clear that the state is permitted to assess whether a belief is sincerely held and religious in nature. See, e.g., United States v. Seeger, 380 U.S. 163, 185 (1965) ("[W]hile the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.' This is the threshold question of sincerity which must be resolved in every case. It is, of course, a question of fact—a prime consideration to the validity of every claim for exemption."); Kane v. de Blasio, No. 21-CV-7863, 2021 WL 5909134, at *5 (S.D.N.Y. Dec. 14, 2021) (finding a request for supplemental information was "geared towards developing a factual basis for reaching a

18

conclusion as to whether any particular Plaintiff's beliefs are sincerely held and religious in nature, both of which are permissible inquiries and questions of fact"). Here, although the Court acknowledges a fine line between probing the sincerity of a belief and weighing that belief's internal consistency, the Court finds that a limited factual inquiry of the type pursued by Defendants is narrowly tailored to stem the spread of COVID-19 because it enables the state to distinguish between sincerely held religious beliefs and those beliefs that are either contrived or not religious in nature. Indeed, if Defendants' carefully designed exemption process is not narrowly tailored to grant exemptions only to those with sincerely held religious objections, it is difficult for the Court to conceive of an exemption process that would be.

As such, even if Defendants' exemption process is subject to strict scrutiny, the Court finds Plaintiffs unlikely to succeed on the merits. Because likelihood of success on the merits is a necessary precondition to the granting of a temporary restraining order or preliminary injunction, Plaintiff's request must be denied.

### C. Irreparable Harm and the Public Interest

Because the Court has not found a likelihood of success on the merits, it need not consider whether Plaintiffs have shown irreparable harm nor whether the public interest weighs in favor of granting an injunction. See, e.g., LoFranco v. Port Auth. of New York & New Jersey, No. 12CV-8664, 2013 WL 139637, at *3 (S.D.N.Y. Jan. 11, 2013) ("[B]ecause LoFranco is unlikely to succeed on the merits, this Court need not consider whether he has shown a likelihood of irreparable harm."); McCluskey v. Spitzberg, No. 20-CV-4015, 2021 WL 3823672, at *2 (2d Cir. Aug. 27, 2021) ("Because McCluskey's failure to establish a likelihood of success on the merits suffices to dispose of this appeal, we need not consider the district court's additional conclusion that he had not established irreparable harm.")

### V. CONCLUSION

Balancing public health and religious liberty is a difficult endeavor and the law in this area is evolving rapidly. While Plaintiffs' request for a temporary restraining order and preliminary injunction is denied at this time, the Court will entertain a renewed motion if warranted by new developments in Second Circuit or Supreme Court case law.

Accordingly, it is hereby:

**ORDERED**, that Plaintiffs' request for a temporary restraining order and preliminary injunction, Dkt. No. 4, is hereby **DENIED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:   March 7, 2022
         Albany, New York

_____
LAWRENCE E. KAHN
United States District Judge